# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3433 | **DATE** | AUG 28, 2002 |
| **CASE TITLE** | Ellen Swartz Godfrey    v    Chester T. Kamin, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ☒ Memorandum opinion and order entered.
Accordingly, this court grants defendants' motion for summary judgment in its.
entirety and enters judgment in favor of defendants.

(11) ☒ For further detail see order attached to the original minute order.

| | | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | AUG 3 0 2002 | 34 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

ELLEN SWARTZ GODFREY, as Trustee of the )
William Swartz Trust dated May 26, 1083, )
                                )
          Plaintiff, )
                                )     No.    01 C 3433
                                )
     v.                         )     Judge Robert W. Gettleman
                                )
CHESTER T. KAMIN, HERBERT B. OLFSON, )
JENNER & BLOCK, an Illinois partnership, and )
JENNER & BLOCK, an Illinois limited liability )
company, )
                                )
          Defendants. )

**DOCKETED**

**AUG 3 0 2002**

## MEMORANDUM OPINION AND ORDER

        Plaintiff Ellen Swartz Godfrey ("Godfrey") as trustee of the William Swartz Trust (the "Trust"), on behalf of the Trust and its beneficiaries, has filed a three-count complaint in this diversity action against defendant-trustees Chester T. Kamin ("Kamin"), Herbert B. Olfson ("Olfson") and the law firm of Jenner & Block ("Jenner") alleging breach of fiduciary duty for making improper investments (Count I) and improper loans (Count II), and for engaging in improper transactions (Count III).

        Defendants filed a motion for partial summary judgment pursuant to Fed.R.Civ.P. 56 asserting that all claims against defendant Olfson, the claims against the remaining defendants alleged in Counts II, III, and a portion of the claims in Count I against Jenner and Kamin, are barred by the statute of limitations. In an effort to avoid piecemeal dispositive motions, in response to this court's direction to supplement their pending motion with any other grounds defendants contended warranted summary judgment, defendants filed a supplemental motion for summary judgment asserting that: 1) plaintiff lacks standing to sue on behalf of the Trust; 2) plaintiff's consent to the Estate's transactions and failure to establish that the Estate suffered damages from certain transactions defeats her claims; and, 3) plaintiff's consent to the Trust's

investment strategy defeats all claims relating to that issue.[1] For the following reasons, the court grants defendants' motion for summary judgment as to Counts I, II and III in their entirety.

## FACTS[2]

On May 26, 1983, William Swartz ("William") created the Trust as part of his estate planning which, during his lifetime, would pay him income to support himself and his wife Mary Swartz ("Mary"). Pursuant to the terms of the Trust, William was the sole Trustee until such time as he was no longer capable of properly managing his affairs. At such time, the Trust provides that Williams' son, Robert S. Swartz ("Robert"), and Olfson are appointed successor co-trustees. The Trust then breaks apart the replacement requirements in the event that Robert and/or Olfson resign.

After William's death, the Trust was to be funded with the majority of the assets in William's estate (the "Estate"), including companies he owned and controlled, Embosograph Companies ("Embosograph"). Under the terms of the Trust, following William's death, Mary receives all of the income of the trust during her lifetime and as much of the principal of the Trust as the trustees deem necessary for her support and care. The Trust then designates plaintiff Godfrey, her sister Diane Williams ("Diane"), and their brother Robert as contingent remainder beneficiaries of the Trust, allowing them to share the Trust's assets only upon Mary's death.

During the time period at issue in the instant case, Olfson and Kamin were partners in defendant Jenner & Block law firm. William designated Olfson and Robert to act as co-executors

---

[1] In addition to filing a responsive brief and Local Rule 56.1 documents, plaintiff filed a motion to strike exhibits 6, 18, 23, 26, 27, 28, 30, 32, 48-58, 60, 61, 67, 68, 75, 76, 80, 81 and 85, and to strike paragraphs 7 (third sentence), 38, 46 (second sentence), 48, 49, 51-60, 64-80, 81(second sentence), 85-92, 120, 121(b)-(h), 122(a)-(e), 124, 129(a) & (b), 133, 134, and 137 from defendants' LR 56.1 statement. Because the documents objected to by plaintiff are not necessary for this court to reach the merits of defendants' motion, the court denies plaintiff's motion as moot. The court notes, however, that while it will not consider the actual documents cited in plaintiff's motion to strike, the court will consider plaintiff's answers and admissions made to certain paragraphs in her response to defendants' LR 56.1 statement of additional facts regarding such documents.

[2] The facts are taken from the parties' LR 56.1 undisputed statements of fact, and the supporting documents thereto. The court will not consider "denials" that do not contain references to facts in the record, as required by LR 56.1(3). *See*, Pendleton v. LaSalle National Bank, N.A., 2002 WL 745790 at *1 (N.D.Ill. April 26, 2002).

of his Estate, and upon his death, to take over as co-trustees of the Trust. William died on November 11, 1987. From November 11, 1987, through December 30, 1990, Olfson was co-executor of William's Estate, at which time the Estate was closed and Olfson was discharged as co-executor. Prior to closing the Estate, Arthur Freeman, an attorney with Schwartz & Freeman, advised Mary not to approve the accounting and audit submitted by the executors. Freeman warned Mary that "once you approve the accountings and release and discharge the executors and trustees they no longer can be held responsible for any actions or omissions on their parts which occurred during the administration of the estate or trust."

Godfrey wrote to Freeman "express[ing] our appreciation for the care and attention you have taken to bring to my attention, and the attention of the family, your concerns over the final accounting of Bill's Estate and Trust." Godfrey notified Freeman, however, that "[w]e understand that you have recommended a further accounting but we have decided that this is not necessary." Despite Freeman's advice, Godfrey, Diane and Mary all signed consent and approval forms to the closing of the Estate, which were filed in Lake County Circuit Court on December 28, 1990.

In May 1991, Olfson suffered a stroke and since that time has suffered major medical problems that leave him unable to provide testimony either through a deposition or in court, or to aid in his own defense of this action. On March 9, 1992, Olfson resigned as co-trustee of the Trust.

Pursuant to the terms of the Trust, on April 14, 1992, Kamin succeeded Olfson as co-trustee with Robert. Five years later, in April 1997, Ellen and Diane received a letter from Kamin in which Kamin stated that he had agreed to become the successor co-trustee because of the long-standing relationship between Jenner & Block and the family and because of his understanding that the family was in agreement as to how the Trust would be administered. Kamin further stated his intention to resign as co-trustee due to Ellen's and Diane's threats of litigation and the "disharmony" in the family, and requested a release from liability. Godfrey and Diane did not respond and on July 9, 1997, Kamin sent a second letter confirming his resignation.

After Kamin's resignation, Robert remained a trustee and Harris Bank was appointed as the corporate co-trustee. When both Robert and Harris Bank resigned, Godfrey was appointed as the successor individual trustee on May 7, 2001. The instant action was filed on May 8, 2001. On July 23, 2001, Comerica Bank & Trust, N.A. ("Comerica") was appointed the successor corporate co-trustee. Comerica is not a party to the instant action.

### Estate's Loans To Embosograph

Between February 1998 and December 1988, prior to the closing of the Estate and during Robert's management of Embosograph the Estate made nine loans to Embosograph totaling just over $3 million. It is undisputed that all of the beneficiaries of the Estate and Trust had knowledge of the first loans at the latest by September 30, 1988, and received notice of all additional loans made thereafter. The Trust provides that the trustees have the power and discretion to make secured or unsecured loans of trust funds.

Godfrey received a B.A. in history from Stanford University in 1964. Her business experience includes working for the publishing company, founded by her husband. Godfrey ultimately became president of that company, which evolved into a software and internet business. On November 8, 1988, Godfrey wrote Olfson a letter alerting Olfson that Godfrey would be in Chicago on November 18 and would like to meet. The letter also included the following with regard to the loans the Estate made to Embosograph:

> . . . I would like to make clear my position in regard to Embosograph. As both a director of the company, and as an inheritor of my father's estate, I believe that I should be kept current about the affairs of Embosograph.
>
> What I think appropriate is that I receive the kind of financial information that a director of a company would normally expect. In the case where the company is losing money and has new management, it seems to me that what is required is a "turnaround budget". Then the directors should get monthly financial statements comparing budget to actual: revenues, expenses, profit and loss. Considering the cash situation, I believe monthly up-dated cashflows showing revenues broken down in some meaningful way, and expenses ditto, plus projected borrowings from the estate is appropriate.
>
> I have expressed those views to Robert repeatedly over the last year. I understand the unique problems associated with the move and the reorganization, but on the other hand, business management requires close monitoring of the financial situation; the

4

more difficult the situation the more critical both cash and financial management become.

I want you and Robert to know that I am behind you in your endeavors to turn Embosograph around, that I want to be supportive, and that I know how hard Robert is working and how totally dedicated he is to Embosograph's well-being. I believe that my requesting this information will work to the benefit of Robert and of Embosograph.

Godfrey, Robert, Mary and Olfson met on November 18, 1988, and Godfrey wrote notes of

the meeting and sent them to Mary, Robert, Diane and Olfson, asking Robert and Olfson to contact

Godfrey if something was wrong or omitted from her notes. The notes included the following:

[Olfson] outlined Embosograph situation and [Mary's] personal situation. He described [Mary's] financial holdings and gave two estimates of her net worth. Later in the meeting [Godfrey] requested [Mary] get periodic statements from Stan Golan at Dean Witter. Olfson agreed to this . . ..

[Olfson] stated that [William] had taken capital out of Emboso and that it had run down during his illness (over the last 3 years before he died). It had been losing money for several years, the equipment and methods had not been kept up; no investment had been made in Emboso's future. The bank loan of aprox 1.5 million would not have been renewed without personal security. Emboso could not have been sold. The best that could have been obtained from potential "buyers" was a takeover of the accounts, goodwill and sales and design staff (plus presumably trade secrets, knowhow and technologies) The family would have had to pay $5-600,000 to provide the minimum of 2 weeks severance pay to the majority of the employees who would have been laid off. The alternative chosen was to keep the company running, move, and try to turn it around. It was decided to pay of the bank loan (with Merchandise) and borrow the money from the [Trust]. Later the [Trust] advanced additional money to cover the move and further working capital requirements of Emboso. (Schedule of payments made and projected has been provided by [Olfson] in letters to the family).

This money was advanced although there was not reliable financial info because the info was not available and the alternatives seemed a worse choice. . . . [Robert now intends to put adequate financial accounting and controls in place. It was agreed that within 2 months there would be a plan for implementing such financial controls. This plan would set out when [Godfrey] and [Mary] could expect to receive the kind of meaningful periodic reports [Godfrey] has requested, which would be equal in quality and detail to those supplied to outside directors of similar firms.

[Olfson] stated that Emboso lost about 1 million last year and expects to lose .5 million this year, despite having expensed the entire move. . . .

*       *       *

[Godfrey] asked for information about how the trust money was invested, and a periodic accounting for the money. [Olfson] said he would supply this.

5

[Godfrey] stated that she was satisfied with these explanations. She said that her intent was to be supportive and helpful, and that she felt that requesting the information would serve that purpose. If financial plans were proposed and later changed, that was only to be expected, but plans were needed as benchmarks to understand future development.

In a letter to Godfrey, Diane and Mary, Olfson discussed the facts that Embosograph had: lost over $1.2 million in 1988; already borrowed $3,136,903 from the Estate; and, would continue to lose money without drastic improvements in results. Olfson advised that additional loans to Embosograph might be necessary if those improvements were not made. In this same letter, Olfson requested a release for Robert and himself for any liability relating to the Embosograph loans. Around the time of this letter, Diane contacted Frank Nitikman, an attorney, concerning potentially representing Mary in connection with the Estate, the Trust, and Mary's personal matters including "these events of borrowing and moneys going out, that we were all in a tizzy about."

In September 1989, Embosograph was sold to a third party for $200,000 and the loans from the Estate were not repaid. At the time of Embosograph's sale in September 1989, "it was clear" to Godfrey that the "loans never would be repaid."

Mark Williams Company Debt Reduction

Prior to his death, William made a $1.8 million loan from Embosograph to Mark Williams Company ("Mark Williams"), a company Robert purchased from William. From around the time of William's death in 1987 until Mark Williams ceased operations in the mid-1990s, Robert managed and controlled Mark Williams. At the time of Williams' death, Mark Williams was unable to repay the $1,897,355 indebtedness because Mark Williams was insolvent. Godfrey knew from Robert that Mark Williams was unable to repay the indebtedness because Mark Williams had insufficient cash flow and assets to repay the loan.

In December 1989, Robert told Godfrey and Diane that Mark Williams was unable to repay the $1.8 million indebtedness but that if they would agree to reduce Mark Williams' indebtedness to $200,000, such reduction would facilitate Mark Williams' ability to obtain bank financing. Before the debt was reduced, Robert asked Godfrey to provide "a fresh eye on [Mark

6

Williams'] situation." Robert asked Godfrey "as a person in a similar business of a similar size to come and have a look at his company and talk to his people and give him advice." In response, Godfrey provided Robert with a written "MWC Checklist" of actions that Robert should take at Mark Williams, including securing financing.

Robert wrote Freeman, Mary's independent counsel, a handwritten letter outlining what he felt the terms of the $200,000 reduction note should be, including the fact that the note would be junior to all other indebtedness and that payment would be made out of Mark Williams' profits after taxes and debt service. Freeman, communicating through Godfrey, advised Mary not to sign the consent to the Mark Williams debt reduction. Paul Williams ("Paul"), Diane's husband at that time and an investment banker for Nuveen, had conversations with Godfrey, Diane and Robert about the debt reduction and told them that he "didn't think it was the right thing to do." Paul told Diane that he "didn't think it was a fair deal," and told Robert that he "didn't think that's what his father would have wanted." Paul was experienced in investment banking and municipal bond financing.

Contrary to this advice, Mary, Godfrey and Diane signed a document dated December 28, 1989, that provided in part that the three "agree[d] and consent[ed] that [Robert] and [Olfson], as executors of the Estate . . ., shall execute and perform the letter agreement . . . under which the estate shall accept a promissory note of [Mark Williams] in the principal amount of $200,000 in full payment and discharge of the indebtedness of [Mark Williams] held by the Estate represented by an account receivable in the amount of $1,897,355." The documentation for such note did not provide for the Estate (and subsequently the Trust) receiving a security interest in any property to support the note. These incidents occurred prior to the time that, against the advice of Freeman, Godfrey, Diane and Mary all signed and filed a consent to the approval of the final accounting and closing of the Estate on December 28, 1990.

Years later in March 1994, during Kamin's tenure as co-trustee, Mark Williams obtained a $250,000 line of credit from the First Midwest Bank, N.A.. In exchange for the line of credit,

Robert gave First Midwest a security interest in all assets of Mark Williams and a second mortgage on Robert's home in Highland Park, Illinois. After receiving the First Midwest loan, Mark Williams still did not become profitable and ceased operations as of January 31, 1995. Mark Williams was unable to continue operations because it had insufficient working capital. When Mark Williams became unable to pay off the First Midwest loan, the bank received $30,000 from the sale of Mark Williams' assets and foreclosed on and sold Robert's home. Between the funds obtained from the sale both of Mark Williams' assets and Robert's home, First Midwest was unable to obtain the entire $250,000 it loaned Mark Williams.

In a letter dated August 10, 1995, Godfrey sought legal advice from Elizabeth H. Fry of the New York law firm Winthrop, Stimson, Putnam & Roberts. The letter included the following explanation with regard to the Mark Williams debt reduction:

> My brother's company, Mark Williams, recently made an assignment for creditors, narrowly escaping bankruptcy. When this happened, my brother was unable to pay a personal note of $5,000 he owes to my sister and me. No mention was made, during the time Mark Williams was on the verge of bankruptcy, verbally or in writing, of the $200,000 promissory note Mark Williams owes the trust. It appears nothing has been done to secure it.

Godfrey asked Fry: "Should something be done to ensure that the promissory note in the name of Mark Williams is assigned to my brother, personally, so it can be paid from his share of the trust on its dissolution?"

On February 15, 1996, Godfrey sent a memorandum to Diane about a telephone conversation with Robert concerning the $200,000 Mark Williams debt to the Trust. Godfrey stated that Robert had said that "there is now no Mark Williams," "implying the note is a dead issue and no longer due – a position he may be able to sustain unless we get tough on his failure as a fiduciary." Godfrey responded to Robert that "it was his fiduciary duty as trustee to deal with it, to inform us and protect the trust, not ours. We never agreed to forgive this debt and were never informed." Godfrey wrote to Diane that:

> I am more and more certain that Bob regards this note as a formality. He did pay some interest. From things he said it is clear that he intended to pay the money if MWC got rich. If not, well too bad. He doesn't see it as owning [sic] now. We

really need to talk to Art Freeman before he is no longer able to talk to us, but he won't talk without mother's permission.

Mark Williams never repaid the Trust any of the $200,000 owed under the promissory note.

<h3 style="text-align:center">Investment Strategy</h3>

Throughout the entire period that Olfson and Kamin were trustees, the Trust's assets were almost entirely invested in municipal bonds. Throughout this period, the Estate's and then the Trust's funds were invested first through Stan Goland at Dean Witter and in 1993, after Goland's death, through M.B. Vick & Co.

When Kamin became co-trustee in 1992, it was his understanding that the Trust's funds were invested in municipal bonds. Robert told him "that the entire corpus of the trust was invested in extremely conservative investments to protect income, and that his mother had very strong views on that subject, and that that would essentially be the controlling factor in how the trust was invested." Robert also said that "all of the siblings understood that and there was no issue as to that." Either Olfson, or Jenner & Block trusts and estates attorney Richard Brown, confirmed to Kamin what Robert had said concerning Mary Swartz's investment preferences. At one point Brown was told by Robert that he and his sisters would prefer more diversification but "they were not going to press the issue because they wanted to go along with their mother's wishes."

According to Jo An Beck, Mary's accountant beginning in 1989, and the Trust's accountant beginning in 1993, Mary insisted throughout the period that Olfson and Kamin were trustees that she was comfortable with the investment approach of Stan Goland of Dean Witter and her husband William's method of investing in municipal bonds. Mary told Beck that she was risk averse and did not want to change her investment strategy. Mary told Beck that Robert agreed with her and that Godfrey did not agree with this approach.

In the August 10, 1995 letter to attorney Elizabeth Fry, Godfrey stated that "[w]ith the exception of a 10% share in a shopping center, all trust funds are in cash and bonds." Godfrey

set out six "concerns" over which she sought legal advice including that: "No one is managing the trust funds on a professional basis" and that while the "money in bonds is being managed by a reputable firm," "no one appears to be managing the investment strategy."

In a memorandum dated August 27, 1995, sent to Diane and Joe Glossberg, Diane's financial advisor, Godfrey stated that she knew in 1994 that the Trust's funds were mostly invested in bonds and had always been invested in bonds. Godfrey further stated in the letter that she had agreed with Robert, who was co-trustee at the time, in such an investment strategy "at that moment, not as a permanent strategy."

## STANDARDS

"Summary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 668 (7th Cir. 2000), *quoting*, Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (U.S. 1986). While the movant has the burden of affirmatively demonstrating the absence of a genuine issue of fact, the opponent, "on the other hand, 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Shintom America, Inc. v. Car Telephones, Inc., 45 F.3d 1107, 1109 (7th Cir. 1995) (*citations omitted*). In determining whether a genuine issue of material fact exists, the court must review the record in the light most favorable to the non-moving party and make all reasonable inferences in his or her favor. *See*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (U.S. 1986).

## DISCUSSION

As set forth above, Godfrey brings this action as Trustee of the Trust on behalf of the Trust. In Count I, Godfrey asserts that defendants permitted investments of the majority of the Trust's assets in municipal bonds and related instruments and in doing so, they breached their fiduciary duties to the Trust by failing to diversify the Trust's assets as required under the Illinois

10

Trust and Fiduciaries Act. Count II involves the Estate's loans to Embosograph, asserting that Olfson and Jenner breached their fiduciary duties by failing to properly investigate whether Embosograph was credit worthy of the loans and whether Robert was capable of managing the business. Count III concerns the Estate's debt reduction of the loan to Mark Williams that William originally made and which subsequent to his death became part of the Estate. Count III alleges that defendants breached their fiduciary duties by failing to advise the beneficiaries that defendants were representing multiple interests including "the Estate, the Mark Williams Company, the Trust, Robert S and Godfrey and [Diane]" and that these multiple representations constituted a conflict of interest whereby the beneficiaries should have obtained independent legal advice regarding the debt reduction. Godfrey further alleges in Count III that Kamin and Jenner breached their fiduciary duties to the trustees by failing to obtain a security interest for the $200,000 debt on Mark Williams' assets or Robert's personal assets.

## STANDING

Defendants argue that Godfrey's complaint must be dismissed because she lacks standing to assert her claims as co-trustee of the Trust without Comerica Bank, the Trust's current corporate co-trustee, joined as a co-plaintiff. Under Illinois law, "a co-trustee cannot exercise a joint power individually." Madden v. University Club of Evanston, 422 N.E.2d 1172, 1174 (Ill. App. Ct. 1981). In Madden the court held that a co-trustee did not have standing to pursue a claim on behalf of the trust where the other co-trustees had not authorized the litigation. Id.

Godfrey does not dispute this law, but argues that at the time this action was filed, she was the only trustee--the former corporate co-trustee Harris Bank resigned on May 7, 2001, this suit was filed on May 10, 2001, and Comerica was not appointed co-trustee until July 2001. As set forth in Godfrey's brief, in Perry v. Village of Arlington Heights, 186 F.3d 826, 830 (7th Cir. 1999), the Seventh Circuit held that "[b]ecause standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit." The Seventh Circuit has

11

not, however, directly addressed whether a plaintiff must be able to establish standing throughout the entire course of the litigation.[3]

Neither party, however, discusses the terms of the Trust, which provide that even though Godfrey was the only trustee at the time she filed the instant action, she did not have authority to file the lawsuit prior to the time the successor corporate trustee, Comerica, was appointed.

As set forth in the fact section above, the Trust appointed Robert and Olfson as William's successors. The Trust then breaks apart the trustee replacement requirements in the event that Robert and/or Olfson resign. In the event that Robert ceases to continue to act as a trustee, the trust designates Godfrey and Diane, if either or both are willing and able to act in such capacity. The Trust provides, however, that "if for any reason neither of them acts or continues to act as trustee, that vacancy shall not be filed [sic]." With regard to the co-trustee position filled by Olfson, the Trust states:

> IF HERBERT B. OLFSON is removed as a trustee or if for any other reason he does not act or continue to act as a trustee, his successor shall be CHESTER T. KAMIN, and if CHESTER T. KAMIN is removed as a trustee or if for any other reason he does not act or continue to act as a trustee, his successor shall be HARRIS TRUST AND SAVINGS BANK. If HARRIS TRUST AND SAVINGS BANK or any successor corporate trustee is removed as a trustee or for any other reason does not act or continue to act as such, a successor corporate trustee shall be appointed as provided in the Illinois Trusts and Trustees Act ...

With respect to a co-trustee's rights to act without the fellow co-trustee, the Trust states:

---

[3]The issue in Perry was whether a non-resident plaintiff could begin an action challenging the constitutionality of certain local laws where his non-residency defeats his standing at the outset of the litigation, if during the course of the action the plaintiff moves his residency allowing him to achieve proper standing during the course of the litigation. The Seventh Circuit held that it was "not enough for [the plaintiff] to attempt to satisfy the requirements of standing as the case progresses [because] ... [t]he requirements of standing must be satisfied from the outset . . . ." Perry, at 830. There is a split among the circuits that have directly addressed the issue of whether a plaintiff must be able to establish standing throughout the entire course of the litigation. Compare, Qwest Communications International Inc. v. FCC, 240 F.3d 886, 891 (10th Cir. 2001) ("Standing must exist throughout the entire litigation."), with, Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio, 263 F.3d 513, 524 (6th Cir. 2001) ("standing does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed" and cannot later be ousted by subsequent events).

12

Any trustee may from time to time, by signed revocable instrument, delegate to one or more of the other trustees the exercise of all or less than all of the powers conferred upon the trustees jointly.

Under the terms of the Trust, while the family co-trustee slot need not be filled, there must at all times be a corporate trustee overseeing the Trust after such time as Kamin is no longer a co-trustee. There is no evidence before the court that Comerica delegated its authority to Godfrey in accordance with the terms of the Trust. Accordingly, under both the terms of the Trust and Illinois law as set forth in Madden, regardless of the fact that Godfrey filed this action before Comerica was appointed co-trustee, Godfrey had no authority or standing to institute an action on behalf of the Trust without the corporate co-trustee.

For this reason alone, the court grants defendants' motion for summary judgment over the instant complaint. For purposes of completeness, and in the event that Comerica agrees to join in suing the defendants, the court will address the remaining issues before it which provide independent grounds for dismissing Godfrey's action.

## TIMELINESS OF GODFREY'S CLAIMS

Defendants argue that the majority of Godfrey's claims are barred by the statute of limitations. Defendants assert that the five year statute of limitations found in 735 ILCS § 5/13-205[4] applies to all three counts of plaintiff's complaint and that based on the undisputed facts as to Godfrey's awareness of her alleged claims, all of plaintiff's claims, except those stated in Count I concerning the period from May 10, 1996 until July 9, 1997, are time-barred.

---

[4]Section 5/13-205 provides:

Except as provided in Section 2-725 of the "Uniform Commercial Code", approved July 31, 1961, as amended, and Section 11-13 of "The Illinois Public Aid Code", approved April 11, 1967, as amended, actions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.

13

Godfrey responds arguing: 1) laches, not the statute of limitations, applies because of the equitable nature of plaintiff's claims; 2) the three year statute of limitations in 760 ILCS §5/11[5] applies to plaintiff's breach of the trustee's fiduciary duties, and the limitations period is triggered only after the trustee provided an accounting; 3) even if the five-year statute of limitations in § 13-205 applies, the statute has not run against any of the remainder beneficiaries' claims because their interests are not possessory, and has not run against Mary, the life beneficiary, because there was no repudiation by the defendant trustees of their duties or termination of the trust triggering the limitations period; 4) the statute has not run because there is an issue of fact whether all of the beneficiaries had sufficient knowledge of their claims under the discovery rule within the five years prior to filing this action; and, 5) the statute of limitations was tolled either under the fraudulent concealment doctrine or because Godfrey argues Kamin could not have sued Olfson and Jenner.

## LACHES

"Laches is an equitable doctrine that bars an action where, because of an unreasonable delay in bringing suit, a party is misled or prejudiced or takes a course of action different from what he would have taken otherwise." Szymanski v. Glen of South Barrington Property Owners Ass'n, 689 N.E.2d 272, 274 (Ill. App. Ct. 1997) (homeowners' action for breach of fiduciary duty against property owners' association was barred by doctrine of laches; action was not filed until four years after homeowners observed similarities during construction of offending home and no explanation was offered for delay). "Application of the laches doctrine requires a showing of (1)

---

[5]Section 5/11(a) provides:

11. Accounts.
(a) Every trustee at least annually shall furnish to the beneficiaries then entitled to receive or receiving the income from the trust estate, or if none, then those beneficiaries eligible to have the benefit of the income from the trust estate a current account showing the receipts, disbursements and inventory of the trust estate. A current account shall be binding on the beneficiaries receiving the account and on such beneficiaries' heirs and assigns unless an action against the trustee is instituted by the beneficiary or such beneficiary's heirs and assigns within 3 years from the date the current account is furnished.

a lack of diligence by the party asserting the claim; and (2) prejudice to the opposing party as a result of the delay." People v. Hawkins, 690 N.E.2d 999, 1005 (Ill. 1998).

While Godfrey cites a string of very old cases for the proposition that enforcement of a trust and fiduciary duties of a trustee are equitable in nature, these cases do not stand for the proposition that the applicable statute of limitations does not apply to a party's breach of trustee's fiduciary duty claims. Courts in this jurisdiction have held that the five-year statute of limitations period found in §13-205 applies to breach of a trustee's fiduciary duty claims. Pendleton v. LaSalle National Bank N.A., 2002 WL 745790 at *5 (N.D.Ill. April 26, 2002). Further, it is evident from Illinois Supreme Court cases, that both a statute of limitations and the doctrine of laches can apply to claims arising from alleged breaches of a trustees' duties.

In Piff v. Berresheim, 92 N.E.2d 113, 118 (Ill. 1950), the court explained that while the statute of limitations does not begin to run on a claim against a trustee of an express trust until the trust is repudiated or the trust relation between the parties comes to an end, "[a] court of equity applies the doctrine of laches in denial of relief prayed, where the statutory period of limitations has not expired." See also, Sundance Homes, Inc. v. County of DuPage, 746 N.E.2d 254, 262 (Ill. 2001) ("Although statutes of limitation, applicable in legal actions, are not directly controlling in suits seeking equitable relief, courts ordinarily follow statutes of limitation as convenient measures for determining the length of time that ought to operate as a bar to an equitable cause of action. However, depending upon the particular circumstances before the court, equitable relief may be refused although the time fixed by the statute of limitations has not expired, or conversely, relief may be granted even though the limitation period has long since elapsed").

Under Piff, it is evident that the statute of limitations applies once it is triggered, and a defense of laches can be asserted in cases where the statute of limitations has not expired but the defendants can prove that the plaintiff's cause of action was unreasonably delayed and that such delay prejudiced the defendants. The defense of laches is equally available whether the suit is at

15

law or in equity. Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix, 283 F.3d 877, 881 (7th Cir. 2002).

Defendants assert that the five-year statute of limitations in §13-205 applies to bar the majority of Godfrey's claims, and further assert that her claims are equally barred under the doctrine of laches.[6] Addressing the first element of laches, plaintiff's delay in bringing his or her cause of action, while the plaintiff must have knowledge of the facts on which the claim is based, "it is not necessary that plaintiff have actual knowledge of the specific facts upon which his claim is based. If the circumstances are such that a reasonable person would make inquiry concerning these facts, a party will be charged with laches if he fails to ascertain the truth through readily available channels." Bobin v. Tauber, 360 N.E.2d 368, 373 (Ill. App. Ct. 1976).

Under the prejudice element, "if a plaintiff does something that reasonably induces the defendant to believe he won't be sued and the defendant's ability to defend himself against the plaintiff's suit is impaired as a result, the plaintiff can be barred by the defense of laches from suing." Teamsters & Employers Welfare Trust, 283 F.3d at 882. "The rule of laches is particularly applicable where the difficulty of doing entire justice arises through the death of one of the parties to the transaction in question." Bobin, 360 N.E.2d at 373; EEOC v. Vucitech, 842 F.2d 936, 942 (7th Cir. 1988) ("Laches . . . is usually invoked in situations where delay in prosecuting a claim has made the claim harder to defend against because of the death of witnesses or other developments"); Pyle v. Ferrell, 147 N.E.2d 341, 345-346 (Ill. 1958).

In Bobin, the court applied laches to the assignor of a beneficial interest in a land trust's action against the assignee because the plaintiff delayed three years after he had notice of enough facts that he should have made further inquiries to lead to his claim, and by the time he filed such

---

[6]While this defense was not raised by defendants in original briefs supporting their motions for summary judgment, defendants have all pled laches as an affirmative defense in their answers to Godfrey's complaint and thus can properly move for dismissal based on this defense. *See generally*, Tornello v. Deligiannis Bros., 180 F.2d 553, 556 (7th Cir. 1950) (under Fed.R.Civ.P. Rule 8, laches is an affirmative defense which must be pled or it is waived).

16

action a key witness was declared incompetent and was unavailable as a witness to testify. 360 N.E.2d at 373.

In Pyle, 147 N.E.2d 341, the plaintiff son was a former remainder beneficiary who became fully vested of an estate in mineral rights upon the death of his mother, who was the life tenant of the father's estate. The son knew of his ownership in 1932 but never paid taxes on the estate, which was then purchased for delinquent taxes in 1936. The plaintiff commenced an action in 1954 to quiet title to the mineral estate after having never inspecting his property or the property records or paying taxes during the twenty-two years between 1932 and 1954. The grantee of the tax deed to the mineral estate died before the cause could be heard. Based on these facts, the court held the plaintiff was guilty of laches, barring his action: "While [the grantee's] testimony might not have been conclusive, its loss, after the long delay of appellant in bringing his suit, is but another factor pointing up the inequity of granting relief in this case." Pyle, 147 N.E.2d at 345-346.

In the instant case, during the period Godfrey waited to assert the instant claims the testimony and knowledge from two key witnesses has become lost due to declining health in the period following the actions alleged in the complaint. It is undisputed that Mary's attorney, Arthur Freeman, was asked and gave Mary advice on many of the issues addressed in the complaint. This advice was often transmitted through Godfrey and Diane in an effort to allow them to help Mary understand such legal advice. When Freeman and his firm were served with subpoenas regarding information relevant to the instant claims, an attorney in Freeman's offices responded by sending defendants certain handwritten redacted notes taken by Freeman. Defendants' attempts to depose Freeman were met with a motion to quash based on Freeman's poor health.

When defendants then sought to depose Freeman by sending the attorney representing Freeman written deposition questions, defendants were informed that Freeman's health was so poor that he was unable to respond even to written questions. The relevance and potentially

adverse effects such knowledge and testimony of Freeman would have on the viability of Godfrey's claims is evident, in part, from Godfrey's motion to strike all of the notes and their use in the instant motion. It is clear to the court that Freeman has extremely relevant knowledge pertaining to the beneficiaries' awareness and the timing of such awareness of facts underlying plaintiff's claims. The court finds that the loss of such testimony is highly prejudicial to defendants.

Even more prejudicial is the fact that in the years between the time of the knowledge of the alleged conduct in this action and the filing of this action, Olfson's health has declined so far that he is unable to testify or in any way contribute to his own defense. Olfson is a key witness and party to the majority of the acts underlying the basis of Godfrey's claims. The loss of his testimony alone, while "it might not have been conclusive," is a further factor in establishing prejudice. Far more prejudicial is the fact that he cannot aid in his own defense. Based on these facts, the court finds that Godfrey's claims against Olfson are barred by laches.

Laches also applies to bar an action "where, because of an unreasonable delay in bringing suit, a party is misled or prejudiced or takes a course of action different from what he would have taken otherwise." Szymanski v. Glen of South Barrington Property Owners Association, 689 N.E.2d 272, 274 (Ill. App. Ct. 1997). In Szymanski, the plaintiff homeowners sued their property owners association, among others, alleging that the defendants' approval of the design for a neighboring home that was architecturally similar to the plaintiff's home constituted a breach of the defendants' duties under the development's restrictions and covenants. Applying laches, the Szymanski court (689 N.E.2d at 274) held that the plaintiffs' delay of four years before filing the suit, during which time the construction of the offending home was completed, barred his claims:

> Plaintiffs here waited four years before filing suit, and they offer no explanation for the delay. During that four-year time period, construction apparently was completed on the offending home. Plaintiffs claim in their complaint that the offending home "depreciate[s] the value of [their] residence" and they ask for $100,000 in damages from defendants. Had plaintiffs filed suit earlier, defendants would have been in a position to change the design of the offending

home and avoid any damages claim by plaintiffs. Clearly, then, defendants were prejudiced by plaintiffs' unreasonable delay in filing suit.

In the instant case it is clear that Godfrey had knowledge that the majority of funds were invested in municipal bonds or like securities since 1994 at the latest. There is also evidence in the record that Godfrey contacted a New York attorney in August 1995 regarding many concerns with the trust, including the fact that other than 10% of the trust, the rest of the funds "are in cash and bonds" and the "value of the trust principal has not appreciated since 1995." In her correspondence, Godfrey specified her concern that no one appeared to be managing the investment strategy.

Godfrey admits that she never contacted Kamin and told him that she believed that the Trust should invest in equities, regardless of the fact that she knew that this was the investment strategy desired by her mother, the lifetime beneficiary of the Trust, and agreed with by her brother Robert, a co-trustee and fellow remainder beneficiary. It is further undisputed that Kamin at all times was told that the family was in agreement as to the manner in which the Trust funds were invested.

Godfrey argues that her expert states that had the Trust assets been invested sixty percent in stocks and forty percent in bonds, the Trust would have $9.2 million more in assets through November 2001. Clearly if in 1995, or shortly thereafter, Godfrey filed her claim against the then current trustee Kamin, asserting breach of his fiduciary duty for failure to diversify trust investments, a sizeable proportion of the alleged damages could have been mitigated. Based on Szymanski and the undisputed facts before it, the court finds that Godfrey's claims against all defendants asserted in Count I based on the failure to diversify the Estate and Trust's funds throughout the entire tenure defendants were trustees are barred by laches.

### WHICH STATUTE OF LIMITATIONS APPLIES

Plaintiff argues that the relevant statute of limitations is three years from the date from which plaintiff received the latest accounting of the Trust from Kamin on May 11, 1998, pursuant to §5/11. Plaintiff argues, without authority, that because she is suing as the trustee of a

trust, her action is controlled by §5/11. That is not, however, how the Illinois Supreme Court considers the appropriate statute of limitations applicable to a cause of action or how other courts in this jurisdiction have considered this issue.

Plaintiff's three counts all arise from defendants' alleged breaches of their fiduciary duties. In Armstrong v. Guigler, 673 N.E.2d 290 (Ill. 1996), the court addressed whether the plaintiff's claims for breach of the defendant's fiduciary duties toward the plaintiff were governed by the ten-year statute of limitations applicable to written contracts because the defendant's duties arose from a written contract between the two parties. Rejecting the plaintiff's argument that the ten-year limitations period, rather than the five year period provided by §13-206, applied, the Armstrong court held that a claim for breach of implied fiduciary duties, as opposed to breach of a contractual promise, is in essence an action "ex delicto." Id. at 295-296. Accordingly, the five-year residual statute applies. Id.

Rejecting the plaintiff's argument that the ten-year statute applied because she could have stated a claim for breach of the written contract, the Armstrong court reasoned (Id. at 296):

> Contrary to plaintiffs' argument on appeal, a review of the allegations in the complaint reveals that plaintiffs do not seek damages for defendants' failure to perform the contractual duties in the listing agreement. Rather, plaintiffs claim that defendants, in their legal status as agents, breached a general duty to disclose all material information, resulting in a compensable injury to plaintiffs. . . . It is clear that plaintiffs do not seek recovery for any damages resulting from the nonperformance of contractual obligations. To the contrary, plaintiffs are asserting a breach of an implied fiduciary duty based on defendants' failure to disclose that the buyers chose not to assume the mortgages. However, the alleged agreement providing the buyers with a right to assume the mortgages was oral and never reduced to writing or made a part of the real estate listing agreement. Consequently, plaintiffs' claim is not itself an action on a written contract, but is collateral to the contract. Although a written contract may have given birth to a duty to disclose, that fact alone is not dispositive. As seen in other contexts, although a cause of action's lineage may be traced to a writing does not necessarily mean that section 13-206 is implicated.

The Seventh Circuit in Havoco of America, Ltd. v. Sumitomo Corp. of America, 971 F.2d 1332, 1137 (7th Cir. 1992), applied the five-year limitations period in §13-205 to breach of fiduciary duty claims. In a recent opinion from this district, Judge Darrah applied the limitations period in §13-205 to a plaintiffs' claims alleging that the defendants breached their fiduciary

20

duties in conjunction with their responsibilities as trustees and co-administrators of an estate and trust. *See*, Pendleton v. LaSalle National Bank, N.A., 2002 WL 745790 at *5 (N.D.Ill. April 26, 2002).

Plaintiff argues that Pendleton does not apply because the plaintiff in that case did not argue that laches or the three-year limitations period in §5/11 applied. Plaintiff's argument, in addition to being unsupported by any legal authority, is misplaced. It is not the plaintiff's arguments that control which statute of limitations applies to an action. Section 5/11 limits the time period for actions by beneficiaries entitled to receive income from the trust, attacking an accounting provided by the trustee. The section does not apply to actions brought by trustees or remainder beneficiaries. The plaintiff does not cite, nor has this court found, a single case applying § 5/11 as a statute of limitations to an action for breach of a trustee's fiduciary duties. Under Armstrong, even if Godfrey or Mary[7] has standing to bring an action attacking an accounting, it does not follow that the instant action alleging that the trustees' breached their fiduciary duties arising from acts taken beginning in 1986 is regulated by the same statute of limitations. Plaintiff cannot attempt to "procedurally defend against a statute of limitations challenge by claiming a different theory in order to benefit from a longer statute of limitations which is different from that filed by plaintiff." Armstrong, 673 N.E.2d at 296.

Based on the precedent and case law discussed, the court finds that the five-year statute of limitations found in 735 ILCS § 5/13-205 applies to the instant claims.

### DISTINCTION BETWEEN BENEFICIARIES' & TRUSTEES' STANDING

Godfrey argues that the claims asserted in this action are not stale because she, in her former position as a contingent remainder beneficiary, and even Mary, as a lifetime beneficiary, had no standing to assert the claims in the instant complaint prior to the time Godfrey obtained her current standing as a trustee. Godfrey bases this argument on the dismissal of the action

---

[7]Mary, the only current beneficiary, has refused to be a party to this or prior actions brought on behalf of the Trust.

previously filed by Godfrey and her sister Diane as remainder beneficiaries in which this court held that Godfrey and Diane had no standing to bring a direct action against former trustees. *See*, Godfrey v. Kamin, 2000 WL 1847768 (N.D.Ill. Dec. 14, 2000), *affirmed*, 19 Fed.Appx. 435, 2001 WL 1117086 (7th Cir. Sept. 19, 2001).

While it is true that Godfrey and Diane failed to establish standing in their prior action, under Illinois law, Godfrey, Diane, Mary and/or Robert had standing to bring the instant claims during the period in which the defendants remained active trustees. *See*, Giagnorio v. Emmett C. Torkelson Trust, 686 N.E.2d 42, 45-46 (Ill. App. Ct. 1997) (contingent beneficiary had standing to bring alleged breach of fiduciary duty claim against current trustee); Burrows v. Palmer, 125 N.E.2d 484, 487 (Ill. 1955) (same). Further, as explained by the Seventh Circuit in its affirmance of this court's dismissal of Godfrey's former action, Godfrey and Diane in their capacity as remainder beneficiaries had standing to file an action against defendants if they could have pled that they made a demand of the current trustees to file suit and the current trustees refused to bring suit against the former trustees. In such an action, Godfrey and Diane could have asserted causes of action against the former trustees in addition to a claim against the current trustees that their refusal to file an action against the predecessor trustees was a breach of their fiduciary duties as successor trustees. *See*, Godfrey, 2001 WL 1117086 at *4; Restatement (Second) of Trusts §282(1)-(2),[8] *see also*, Clayton v. James B. Clow & Sons, 154 F.Supp. 108,

---

[8]Section 282(1)-(2) provides:

(1) Where the trustee could maintain an action at law or suit in equity or other proceeding against a third person if the trustee held the property free of trust, the beneficiary cannot maintain a suit in equity against the third person, except as stated in Subsections (2) and (3).

(2) If the trustee improperly refuses or neglects to bring an action against the third person, the beneficiary can maintain a suit in equity against the trustee and the third person.

Comment (e) to this section provides in part:

Where the trustee fails to sue. If the trustee fails to perform his duty to bring an action

(continued...)

115 (N.D.Ill. 1957) (contingent remainder beneficiaries had standing to file action against mother-in-law lifetime beneficiary/trustee and third parties to which lifetime beneficiary and trustee sold stock from trust because the lifetime beneficiary/trustee refused to sue). Accordingly, because Godfrey could have alleged breach of fiduciary duty claims either at the time defendants were trustees, or sometime thereafter, the statute of limitations on her claims is triggered at the time her causes of action accrued. *See*, Tontz v. Heath, 170 N.E.2d 153, 158-159 (Ill. 1960).

### TRIGGER FOR CLAIMS ARISING FROM BREACH OF AN EXPRESS TRUST

As set forth in plaintiff's brief, there is a line of Illinois cases holding that the limitations period for breach of an express trust claim does not begin to run until a trustee repudiates the trust or until the trust terminates.[9] Accordingly, the five-year statute of limitations applicable to Godfrey's claims against Olfson, Kamin and Jenner was triggered at the time when the individual trustees repudiated the trust, or terminated their relationship with the trust.

While the Illinois Supreme Court has not addressed the definition of "repudiation," under Seventh Circuit precedent applying Illinois law, repudiation occurs when it is "brought to the attention" of a beneficiary that the trustee breached his fiduciary duties. Jefferson National Bank of Miami Beach v. Central National Bank in Chicago, 700 F.2d 1143, 1151-1152 (7th Cir. 1983). "Repudiation exists whenever the beneficiary is put on notice of facts which would reasonably alert her to the possibility of a breach." Norris v. Wirtz, 1985 WL 5549 at *2 (N.D.Ill. Nov. 26,

---

(...continued)
at law or suit in equity or other proceeding against a third person (see s 177), the beneficiary can maintain a suit in equity against the trustee to compel him to perform his duty. In order to settle the controversy in a single suit and avoid multiplicity of suits, the beneficiary can join the third person with the trustee as co-defendants, and the matter will be disposed of in a single suit.

[9]The court notes that plaintiff's long string cite to these cases is further evidence that Illinois courts must apply a statute of limitations to claims of a trustee's breach of fiduciary duty, otherwise the issue of triggering such statute would never arise.

23

1985). This standard corresponds with the standard applied by an Illinois appellate court in <u>Kay v. Village of Mundelein</u>, 344 N.E.2d 29, 32-33 (Ill. App. Ct. 1975):

> Generally, an action to enforce an express trust is not barred by a mere lapse of time, at least where the trustee has not repudiated, disavowed or acted in hostility to the trust under such circumstances that the cestui que trust has, or should have, knowledge of such improper conduct on his part.

*     *     *

> The rule with respect to the statute of limitations and express trusts is stated as follows: during performance of the express trust there is no cause of action for breach and so the statute of limitations has no bearing on the rights of the beneficiary; but if the trustee violates the trust and the beneficiary knows of such conduct, or could have learned of it by the use of reasonable diligence, the court will apply the statute of limitations.

Without citation to authority, Godfrey argues that "[r]epudiation and breach are not the same" and that "common sense dictates that if they were synonymous, the discovery rule would merge and courts would not distinguish between them." Not a single case cited by Godfrey, however, has any discussion of what constitutes "repudiation" sufficient to trigger the statute of limitations. Pursuant to <u>Jefferson National</u>, <u>Norris</u>, and <u>Kay</u>, under the repudiation prong of the trigger analysis, the court finds that the statute of limitations on each of Godfrey's claims is triggered on that point at which Godfrey, Diane and Mary were aware of sufficient facts that would reasonably have alerted them that the alleged breach had occurred.

Another factor that can trigger the statute of limitations is when the trust relationship between the parties terminates, i.e. when the trustee no longer claims or exercises any authority under the trust. <i>See</i>, <u>Becker v. Billings</u>, 136 N.E. 581, 584-585 (Ill. 1922); <u>Tankersley v. Albright</u>, 80 F.R.D. 441, 446 (N.D.Ill. 1978), <i>see also</i>, <u>Piff v. Berresheim</u>, 92 N.E.2d 113, 118 (Ill. 1950) (statute of limitations begins to run when "the trust relation between the parties comes to an end"); <u>Thomas v. Bourdes</u>, 63 N.E.2d 621, 623 (Ill. App. Ct. 1945) (<i>citations omitted</i>) ("It may be conceded that, so long as a trustee continues to exercise his powers as trustee in regard to property, he can be called to an account in regard to that trust, but when he has parted with all control over the property, and has closed up his relation to the trust, and no longer claims or

24

exercises any authority under the trust, the principles which lie at the foundation of all statutes of limitation assert themselves in his favor, and time begins to cover his past transactions with her mantle of repose. This doctrine also applies to cases of express trust.").

Godfrey does not address "termination" except to assert that if defendants argue that the statute is triggered at the trustees' resignation, defendants "face another hurdle" because the beneficiaries had no standing to sue former trustees. As set forth above, Godfrey, Diane, Mary and Robert all had standing to assert causes of action against former trustees either by having Robert and/or the other co-trustee at the time file the action, or if they refused, the beneficiaries could have filed an action against the current and former trustees together, alleging that the current trustees breached their duties by refusing to file the action. Accordingly, as set forth above, the court finds that Godfrey's claims against defendants are triggered at the time the beneficiaries were made aware of sufficient facts to reasonably alert them to the possibility of the alleged breaches or, if earlier, at the time that Olfson, Kamin or Jenner independently ceased exercising control over the Trust.

With regard to the claim asserted in Count I against Kamin and Jenner that they permitted substantially all of the funds in the Trust to be invested in "municipal bonds and related instruments" during their tenure as trustees in breach of their duties under 760 ILCS § 5/511(a)(3)[10] to diversify the investments in the trust, the undisputed facts as set forth above establish that all of the beneficiaries had knowledge of the fact that the Trust's assets were invested mostly in municipal bonds or related investments by 1994. It is also clear from a letter

---

[10]While Godfrey cites the section in her complaint as 760 ILCS § 5/511(a)(3), the language she quotes is from 760 ILCS § 5/5(a)(3), which provides:

Investments. (a) Prudent Investor Rule. A trustee administering a trust has a duty to invest and manage the trust assets as follows:

\*    \*    \*

(3) The trustee has a duty to diversify the investments of the trust unless, under the circumstances, the trustee reasonably believes it is in the interests of the beneficiaries and furthers the purposes of the trust not to diversify.

written by Godfrey to her brother Robert in 1995, that Godfrey disagreed with this investment strategy. *See*, Smith v. Baptist Foundation of Oklahoma, _ P.3d _, 2002 WL 1370028 at *4 (Okla. June 25, 2002) ("[plaintiff's] cause of action against the trustee [for breach of fiduciary duty arising from trust investment strategy] accrued when he had sufficient information to realize that the investment strategies utilized were not meeting his expectations"). Godfrey even sought legal advice in August 1995 with regard to the Trust's investment strategy. Based on these undisputed facts, the court finds that the statute of limitations on this claim was triggered at the latest by 1995, and therefore, in addition to the court's ruling on laches barring Count I in its entirety, the court finds Godfrey's claims in Count I except for the period from May 10, 1996, through July 9, 1997, are time-barred.

The court also finds that the statute of limitations bars Godfrey's claims in Count II against Olfson and Jenner arising from the Embosograph loans because: 1) all of the beneficiaries were notified of the total amount of loans made from the Trust to Embosograph by 1988; and, 2) it is clear from notes Godfrey made from the November 18, 1988, meeting that the beneficiaries were all aware of the limited information available to the Trustees and the beneficiaries, including a lack of proper financial records from which to make the determination of the financial stability of the company and the propriety of making these loans.

Count III alleges a breach of Olfson's fiduciary duty based on the reduction of the unsecured loan made to Mark Williams by William Swartz, which became an asset of the Trust upon Williams' death, from $1,897,355.00 to an unsecured promissory note for $200,000. Count III seeks a judgment in the amount of $1,897,355.00 from Olfson and Jenner. The count also, however, seeks punitive damages from Kamin and Jenner based on Kamin's alleged breach of his fiduciary duty arising from a failure to advise the Trust and each of its beneficiaries that Kamin and Jenner were also allegedly representing Robert in refinancing his home, and as part of that refinancing Robert gave the mortgage bank a guarantee from Mark Williams pledging the security interest in all the assets of Mark Williams.

The undisputed facts regarding this claim include: 1) William issued the first unsecured loan to Mark Williams; 2) each of the beneficiaries were appraised and discussed the matter of reducing the debt and specifically were advised of the resulting potential such reduction would provide for allowing Mark Williams to obtain other forms of financing; and, 3) that independent counsel (Freeman) and an investment banker (Paul) told Godfrey, Diane, Robert and Mary that the debt reduction was not a prudent financial decision. Godfrey argues that Freeman's advice cannot be used as evidence that she knew or should have known of a claim against defendants because Freeman was representing Mary only, and any advice received by Godfrey to explain to Mary was obtained solely in Godfrey's role as Mary's agent.

In considering a party's knowledge of facts sufficient to trigger the statute of limitations, however, no case cited by Godfrey considers the manner in which the knowledge was obtained, only whether the plaintiff knew or should have known of facts sufficient to alert her of a potential claim. Godfrey admits that while Freeman was retained to represent Mary, he communicated with other members of the Swartz family. Godfrey would speak with Freeman at Mary's request, "as Mary sometimes had difficulty understanding [Freeman's] advice and asked [Godfrey] to help explain it to her," and "[i]f Mary was upset about something she might call [Godfrey] and request that she call Freeman to get him to explain the matter to her so she could explain it to Mary."

In her deposition, Godfrey testified that she understood that Freeman did not think that the Mark Williams debt reduction was advisable and Godfrey drew the implication from Freeman that she should not consent to the debt reduction. It is irrelevant whether Godfrey learned of the viability of the claims against defendants through her interactions with Freeman on her mother's or on her own behalf. The notice of these facts at the time the $200,000 promissory note was issued in December 1989, are sufficient to find that Godfrey had sufficient knowledge of the viability of a potential claim at that time. Accordingly, her claims against Olfson in Count III are time-barred.

Remaining in Count III, however, is Godfrey's claim against Kamin and Jenner regarding a failure to disclose a conflict of interest and the breach of those defendants' duties to guard the interests of the Trust's $200,000 outstanding promissory note when aiding Robert in obtaining loans that required a guarantee on all Mark Williams assets and Robert's home. While William's Will and the Trust grant the executors/trustees the power to make secured or unsecured loans to closely-held companies (the "Companies") and, in conjunction with those loans, to participate in the management of the Companies as officers or otherwise, and to be retained by the Companies at a salary or fee commensurate with the value of his services, there is evidence in the record to create a question of fact as to whether Godfrey had knowledge or notice of the trustees' concurrent representations of potentially conflicting interests. The consequence of this will be discussed in the last section of this opinion.

## TOLLING OF THE STATUTE OF LIMITATIONS

Godfrey argues that the statute of limitations was tolled for two reasons: 1) fraudulent concealment; and 2) "by the unity of interest between the trustees and the wrongdoers, i.e. the defendants could not be expected to sue themselves." "Under Illinois law, the fraudulent concealment will toll the statute of limitations if the plaintiff pleads and proves that fraud prevented the discovery of the cause of action." Clay v. Kuhl, 727 N.E.2d 217, 223(Ill. Jan 21, 2000); McIntosh v. Cueto, 752 N.E.2d 640, 644 (Ill. App. Ct. 2001) ("[F]raudulent concealment must be pled to be available"); 735 ILCS 5/13-215.[11] "As a general matter, one alleging fraudulent concealment must 'show affirmative acts by the fiduciary designed to prevent the discovery of the action.'" Clay, 727 N.E.2d at 223, *quoting*, Hagney v. Lopeman, 590 N.E.2d 466 (Ill. 1992). The mere failure on the part of the plaintiff to learn of a cause of action does not

---

[11]Section 13-215 provides:

> Fraudulent concealment. If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards.

amount to fraudulent concealment. *See*, <u>Nickels v. Reid</u>, 661 N.E.2d 442, 449 (Ill. App. Ct. 1996).

In the instant case, Godfrey has not pled fraudulent concealment or alleged affirmative acts by defendants designed to prevent the discovery of her causes of action. In her brief, Godfrey argues that defendants "failed to inform Godfrey that they had not performed a due diligence on Embosograph, that they failed to inquire into Robert's ability to manage Embosograph, that they were under multiple conflicts of interest, that the loan to Mark Williams was at risk because it was unsecured, and that they had a duty to diversity the Trust's assets."

As set forth above, it is clear that all of the beneficiaries were aware of what facts were known and relied on by the trustees and the lack of available financial data available when the loans were made from the Estate to Embosograph. The beneficiaries were also aware of the financial status of the companies run by Robert, and Godfrey herself was asked by Robert to help him by suggesting ways to help manage Mark Williams and turn it around. It is clear from the undisputed facts that all of the beneficiaries were aware or on notice of facts or that they could have discovered all of the alleged information through ordinary diligence. "Defendant[s'] action or lack of disclosure cannot reasonably have concealed plaintiff's injury from her based on the information she had available to her." <u>Eckmann v. Diedrich</u>, 2002 WL 1433736 at *2 (N.D.Ill July 2, 2002). Accordingly, the court rejects plaintiff's argument that the statute of limitations was tolled through fraudulent concealment because she has failed to plead or offer evidence to prove sufficient facts to support application of this doctrine.

Plaintiff next sites to an 1899 United States Supreme Court case[12] and a 1911 Massachusetts case,[13] arguing that such cases stand for the proposition that the statute of limitations did not begin to run until Kamin resigned, because any suit brought by Olfson, Kamin or Jenner would have been a suit against themselves and the trustees could not have been

---

[12] <u>City of New Orleans v. Warner</u>, 175 U.S. 120 (1899).
[13] <u>Bremer v. Williams</u>, 96 N.E.687 (Mass. 1911).

expected to sue themselves or each other. Neither these cases nor any of the cases cited by

Godfrey stand for the proposition that because Olfson and Kamin were partners in the same law

firm, one suing the other, or the law firm for which they worked, is considered suing themselves.

Further, as set forth above, under Illinois law, during Kamin's term as trustee, Godfrey and the

other beneficiaries had standing to sue Kamin and, if Kamin refused to sue Olfson, the

beneficiaries had standing to sue both Kamin and Olfson as well as Jenner. Accordingly, for the

same reasons the court rejected Godfrey's argument that the statute was never triggered for failure

of standing to sue, this same analogy cannot be used to argue that the statute of limitations was

tolled.

Based on the facts as set forth above, the court finds that in addition to laches, all of the

claims asserted against Olfson are time-barred based on the time the beneficiaries knew or should

have known of such claims, and because Olfson ceased having any control over the Trust and its

assets, thus terminating his relationship with the trust, by March 1992, over five years prior to

filing the instant action.

## EFFECT OF CONSENTING TO DISCHARGE OF EXECUTOR AND CLOSING ESTATE

Defendants assert that Godfrey, Diane, Mary & Robert's written consent to Olfson's

discharge as executor and the closing of the Estate bars each of her claims based on acts taken by

the executors prior to closing the Estate, including the Embosograph loans, the Mark Williams

debt reduction and the investment of the Estate's assets primarily in municipal bonds. The

Probate Act of 1975, 755 ILCS 5/28-11(f) provides:

> (f) In the absence of fraud, accident or mistake, an order discharging the
> independent representative and declaring the estate closed is binding on each
> person whose receipt or approval was filed with the report and on each person to
> whom notice thereof was given in compliance with subsection (e) except a ward
> for whom no personal fiduciary is acting.

Illinois courts have consistently held that this section "codifies in probate actions general

principles of *res judicata* and collateral attack" and, accordingly, bars "matters actually

determined [and] also . . . those matters which could have been raised" in the Probate court action closing the estate. Hooks v. Bonner, 543 N.E.2d 953, 955 (Ill. App. Ct. 1989); Matter of Estate of Aschauer, 544 N.E.2d 71, 75 (Ill. App. Ct. 1989). "[T]he ground of fraud, accident or mistake, is limited to situations where the court's jurisdiction (or colorable jurisdiction) was based upon the fraud, accident or mistake; and it does not include the right to attack such judgment on the ground it was obtained by false testimony, concealment or the like." In re Luer's Estate, 108 N.E.2d 792, 794 (Ill. App. Ct. 1952).

In In re Luer's Estate, 108 N.E.2d at 793, the court gave examples of situations that would merit an attack:

> Thus, if a party was prevented from presenting the merits if his case by the fraud of his opponent, or by mistake, unmixed with any omission, negligence or fault on his own part, he could attack the final judgment after the term. But false testimony, or false assertions of liability, cannot be advanced as grounds for setting aside such a judgment, for if that were permitted, there could never be an end to litigation.

It is undisputed that the beneficiaries had notice of the probate action and signed their approval and consent to the accounting and closing of the Estate. It is further undisputed that each of the beneficiaries had knowledge that Freeman, independent counsel, had advised Mary to demand a further accounting and advised not to sign the consent to closing the Estate. Freeman even advised Mary, and the beneficiaries had knowledge of this advice, that in signing the consent, they were legally barred from attacking the executor Olfson's actions with regard to all acts taken on behalf of the Estate up to the closing of the Estate.[14] The beneficiaries all had knowledge of this legal advice but chose to ignore such advice and signed the forms.

In somewhat analogous situations, without however the benefit of independent legal advice, Illinois courts have applied and interpreted this statute as a bar to a beneficiary's breach of fiduciary duty claims arising from actions taken by the executor prior to the closing of the estate. In Houser v. Michener, 313 N.E.2d 651, 655-656 (Ill. App. Ct. 1974), the court held that the

---

[14]At her deposition, Godfrey specifically admitted that she understood the legal ramifications that by signing the Receipt, she accepted what the executors had done.

plaintiff beneficiary's breach of fiduciary duty claim, for alleged mismanagement of farm property that was part of estate against the defendant executor, was statutorily barred by her entry of an appearance in the probate action and her consent to the discharge of the estate. *See also*, Hooks, 543 N.E.2d at 955 (beneficiary's claim that fraud was committed in valuation and distribution of estate was barred by statute, as collateral attack on probate court's final accounting: complaint failed "to allege facts from which a court could reasonably infer that the jurisdiction of the court was invoked by conduct which deprived plaintiff of an opportunity to assert her rights in the accounting.").[15]

Based on the undisputed facts before it, in addition to this courts' rulings on laches and the statute of limitations, the court grants defendants' motion for summary judgment on plaintiff's claims against Olfson and Jenner for alleged breaches of fiduciary duty arising from the loans made to Embosograph, reduction of the loan to Mark Williams, and the failure to diversify the Estate's assets through the closing of the Estate, finding such claims are barred by § 5/28-11(f) of the Probate Act of 1975.

---

[15]The court finds the sole case cited by Godfrey for the argument that Olfson can be sued for conduct taken prior to the closing of the Estate regardless of the beneficiaries' consent, Matter of Winston's Estate, 425 N.E.2d 973 (Ill. App. Ct. 1981), is factually distinguishable. In Matter of Winston's Estate, the plaintiff son/remainder beneficiary sued the estate of his mother and the executor of her husband's estate, for an accounting of trust assets or proceeds received by the mother because of her alleged conversion of such assets. The plaintiff lived in Europe throughout the entire period his father's estate was in probate. The final account showed that the mother had received the deceased father's interests in certain assets but did not articulate whether she received such interest under the residuary clause of the deceased's will, and thus as the acting trustee of the trust in which the son was a beneficiary, or in her individual capacity. Under these facts, the court held that the plaintiff's claims were not barred because they did not constitute a collateral attack on the judgment. *Id.* at 980. The court reasoned that the issue of in which capacity the mother received the assets was not "determined during the probate of [the] estate, and the position taken by petitioner is consistent with the information contained in the final account and does not constitute an attack upon that account." *Id.* at 980. In the instant case, it is undisputed that the assets from Williams' estate were all received into the estate and trust properly and that Olfson never attempted to abscond with such funds for his own benefit. Godfrey's claims that Olfson's conduct in making the loans to Embosograph, reducing the debt to Mark Williams and implementing certain investment strategies with the Estate's assets was a breach of his fiduciary duties to the estate and beneficiaries of the trust, like those claims in Houser and Hooks discussed above, directly attacks the probate court's judgment finalizing these actions taken in accordance with probating Williams' Estate.

## CONSENT TO PROBATE COURT ORDER DISCHARGING AND CLOSING ESTATE BARS CLAIMS AGAINST SUCCESSOR TRUSTEES

Defendants assert that Section 14 of the Illinois Trust and Trustees Act, 760 ILCS § 5/14(2), bars Godfrey's claims against Kamin as successor trustee for those actions taken prior to the discharge of Olfson as administrator of the Estate and the closing of the Estate. Section 5/14 provides:

> Powers and duties of successor--Liability for acts of predecessor-- Approval of accounts. (1) A successor trustee shall have all the rights, powers and duties, which are granted to or imposed on the predecessor. (2) A successor trustee shall be under no duty to inquire into the acts or doings of a predecessor trustee, and is not liable for any act or failure to act of a predecessor trustee. (3) With the approval of a majority in interest of the beneficiaries then entitled to receive or eligible to have the benefit of the income from the trust, a successor trustee may accept the account rendered and the property received as a full and complete discharge to the predecessor trustee without incurring any liability for so doing.

In addition to the statutory bar of § 5/14, "[i]t is the uniform rule [under Illinois law] that a successor trustee is not liable for the actions or defaults of the predecessor trustee, unless such successor trustee participates in the conversion of the property from the uses designated in the trust." Landau v. Landau, 101 N.E.2d 103, 107 (Ill. 1951). In Hatfield v. First Nat. Bank of Danville, 46 N.E.2d 94, 99-100 (Ill. App. Ct. 1942), the court dismissed claims against a successor trustee under similar circumstances where the plaintiff beneficiaries were adults at the time of the probate of the estate and consented to the discharge of the former trustee, reasoning:

> Under the facts and circumstances in evidence herein we see no force in the plaintiffs' contention that the Trustee became liable to the beneficiaries for breach of trust in neglecting to file suit against the predecessor Trustee upon assuming its duties as successor Trustee. At the time of the final report and discharge of the previous Trustee in 1931 all the plaintiffs, then adults, entered their respective appearance in writing and expressly consented to the discharge of the former Trustee and the appointment of the defendant Trustee. They filed no suit at that time when they might have sued, filed no objection to the report, and made no request for the sale of the stock in question. Under such facts and circumstances, we hold that by so joining therein they have waived and are estopped in equity from asserting liability as against the defendant Trustee for failure to file such alleged cause of action against the former Trustee or to successfully assert any such claim against the Trustee under the facts appearing herein.

Godfrey cites to Dick v. Peoples Mid-Illinois Corp., 609 N.E.2d 997, 1003 (Ill. App. Ct. 1993) and Bullis v. DuPage Trust Co., 391 N.E.2d 227, 231 (Ill. App. Ct. 1979), wherein the

33

courts held that a successor trustee is not liable for breaches of trust committed by the former trustee unless the successor himself is guilty of a violation of duty to the beneficiaries, listing the following duties: (1)where his predecessor improperly purchased a retained property and he continues to retain it; (2) where he neglects to take proper steps to compel his predecessor to turn over trust property to him; or (3) where he neglects to take proper steps to compel his predecessor to redress a breach of trust committed by him.

It is undisputed that Kamin was not personally involved in issuing the loans to Embosograph, reducing the debt to Mark Williams, or Olfson's decision to allow the Estate's funds to remain mainly invested in municipal bonds or similar securities. There is also no evidence that any of the beneficiaries raised Olfson's alleged breaches of his fiduciary duties with Kamin or asked Kamin to pursue a claim against Olfson or Jenner on behalf of the Trust.

Section 5/14(2) specifically provides that a successor trustee has "no duty to inquire into the acts or doings of a predecessor trustee." As set forth above, a beneficiary has standing to sue a former trustee when a successor trustee refuses a beneficiary's request to sue a former trustee, whereupon the beneficiary must sue the successor for breach of his fiduciary duty to take proper steps to compel his predecessor to redress an alleged breach of fiduciary duty along with the predecessor trustee himself. This procedural requirement corresponds with the third example in Dick of when the successor trustee, as well as his or her predecessor, is guilty of a violation of duty to the beneficiary.

This interpretation is supported by Quadion Corp. v. Mache, 738 F.Supp. 270, 275 (N.D.Ill. 1990), where the court held that pursuant to the statute, a successor trustee could not be found liable for a predecessor's violation of its fiduciary duty by failing to disclose latent defects in the sale of trust property. Accordingly, the court finds the claims against Kamin and Jenner in their capacity as successor trustees arising from any alleged breaches of fiduciary duty for the loans to Embosograph, the reduction in the loan to Mark Williams, or the investment strategy of the trust during the period Olfson was executor/trustee are barred under §5/14(2).

34

Defendants assert that even if defendants breached their fiduciary duties in connection with the Mark Williams debt reduction, Godfrey's breach of fiduciary duty claims asserted in Count III fail because Godfrey cannot establish damages to the Estate.

> When a trustee breaches a trust agreement, whether wilfully, negligently, or by oversight, he is liable for any loss to the estate resulting from the breach and must place the beneficiaries in the position they would have held had the breach not occurred. Specifically, a trustee in violation of the trust is chargeable with (1) any loss or depreciation in value of the trust property as a result of the breach; or (2) any profit made by him as a result of the breach; or (3) any profit which would have accrued to the trust had there been no breach.

Grot v. First Bank of Schaumburg, 684 N.E.2d 1016, 1018 (Ill. App. Ct. 1997)(*citations omitted*). Defendants assert the following undisputed facts: 1) at the time of William's death, Mark Williams was unable to repay the $1,897,355.00 indebtedness because Mark Williams was insolvent; 2) First Midwest was unable to recover all of the $250,000 that it loaned to Mark Williams even with the security interests on the assets of Mark Williams and Robert's home (the bank recovered only $30,000 through a sale of Mark Williams' assets and even foreclosing on and selling Robert's home together did not net the $250,000 owing on the line of credit); and, 3) when it ceased doing business, Mark Williams owed over $300,000 in taxes that were never paid. Based on this evidence, defendants assert that there is no basis for Godfrey's claim that somehow Mark Williams could have repaid the full $1.9 million debt or repaid the reduced $200,000 note.

Godfrey argues that because First Midwest was able to obtain collateral in the form of Robert's home and personal guaranty, "[w]hy couldn't defendants have gotten that collateral?" While Godfrey's argument is weak, and this court has already dismissed all claims arising from the actual reduction of the debt from $1,897,355.00 to $200,000, there still remains Godfrey's claim that based on Kamin's and Jenner's concurrent representations of the various family interests, the attorneys failed to protect the Trust's $200,000 loan through their failure to disclose to the beneficiaries his involvement with other matters relating to loans that included in their terms security interests in Mark Williams' and Robert's assets.

35

Although there may have been a technical violation to make express disclosures of Olfson's and then Kamin's multiple representations and resulting conflicts of interest, the conflict is no different than the conflict that existed with regard to attorneys at Jenner representing the personal and corporate interests of the Swartz family throughout William's life and subsequent to his death, including borrowers and debtors.

This relationship between Olfson, Kamin, Jenner and the Swartz family is common in family representation that is provided to persons of means, their closely held companies and related entities, including the drafting of wills and trusts and management of estates. The court further notes that both the Trust and Williams' Will grant to the trustees/executors the authority to make secured or unsecured loans to "any or all closely-held business interests," along with the power (in addition to those powers granted as trustees/executors of the will/estate) to "participate in the management of the Company as officers or directors or otherwise, with appropriate compensation." With regard to these powers, the Trust provides (and the Will has a comparable paragraph with the terms estate and executor in place of the trust and the trustee):

> The trustees shall exercise ordinary business judgment in determining how long such securities shall be retained, it being my intention that the trustees retain such securities as long as in their judgment it is in the best interest of the beneficiaries, and the trustees shall not be liable for any loss resulting from such retention. I realize that I am exposing the trusts to risks inherent in all business operations but I believe those risks justifiable by the possibility of preserving the capital and income values of such securities. To the extent that the trustees render service to the Company, they may charge the Company for those services. Nothing in this declaration shall be construed to prevent any individual trustee from being employed by the Company at a salary or fee commensurate with the value of his or her service ...

It appears Godfrey has seized upon one incident of which she seeks to take advantage in an effort to recoup alleged losses incurred pursuant to the plan that was instituted by all the beneficiary Swartz family members along with the trustees -- allowing Robert to continue to run Mark Williams and attempt to turn the company into a profitable organization. Though this would not excuse the breach of an ethical duty under the Rules of Professional Conduct of a full disclosure by the trustees of the representation of potentially conflicting interests, plaintiff has

36

failed to establish any damages to the Trust arising from defendants' failure to formally disclose their multiple representations in this particular instance.

One of the conceded purposes of the debt reduction was to improve the financial status of Mark Williams in order to obtain outside financial loans that would not have been available had the original $1.8 million dollar debt remained on Mark Williams' books. The later plan in providing subsequent lenders security interests in Mark Williams' and Robert's assets was merely a fruition of the prior plan that was made with full disclosure to and consent by all beneficiaries – including Godfrey – after having received both legal and financial advice from outside sources. It appears clear that the beneficiaries with full knowledge of the financial and administrative difficulties occurring at Mark Williams, believed that Mark Williams could not have continued its operations had the company not received loans from outside sources, and that lenders would not have consented to such loans had Mark Williams and Robert not agreed to provide security interests in both the company's and Robert's personal assets.

Plaintiff and the beneficiaries knew that Mark Williams could not repay the trust the $1.8 million loan, and willingly reduced the debt to $200,000 in order to attempt to breathe new life into Mark Williams through outside financial sources. There is no evidence that the Trust would have been able to recoup its $200,000 had defendants provided a full disclosure of their potentially conflicting interests and attempted to secure the $200,000 loan. It is evident from the terms of First Midwest loan that the $250,000 line of credit would not have issued had the Trust's loan to Mark Williams been accorded a security interest in Mark Williams' assets superior to that of First Midwest. The court finds that Godfrey has failed to establish a genuine issue of fact that the Trust incurred any damages from defendants' alleged ethical violations. Accordingly, in addition to Godfrey's lack of standing to assert such claim, the court grants defendants' motion for summary judgment over Count II in its entirety.

## CONCLUSION

For the reasons set forth above, the court grants defendants' motion for summary judgment in its entirety and enters judgment in favor of defendants.

**ENTER:**     **August 28, 2002**

**Robert W. Gettleman**
**United States District Judge**